The third case for argument is 25-2869 from the District of Minnesota, Dr. Tara Gustilo v. Hennepin Healthcare System. Mr. Craig. Thank you, Your Honor. May it please the Court, my name is Daniel Craig. I am counsel for the appellant here, Plaintiff Below, Dr. Tara Gustilo, M.D. My client was the chair of the Hennepin Healthcare System, otherwise known as Hennepin County Medical Center, OBGYN Department, first on an interim basis and then was appointed by permanent chair years before the events of this case. Prior to 2020, she had a good record both as a doctor and as chair of the department. And after 2020, in terms of her role as a doctor and in the actual metrics of a successful OBGYN department, she continued to be a good doctor and chair. What changed was that after the murder of George Floyd in 2020, HHS, like many institutions in this country, wanted to participate in the discussion around race or anti-racism and police misconduct. Its board approved a resolution declaring racism a public health emergency, and the doctors in the OBGYN department participated in that discussion, including attending a rally at the White Coats for Black Lives Matter rally in their HHS uniforms. And my client, on her personal Facebook page, questioned the new orthodoxy, or at least posted comments or reposted comments intending to question some of the new views that were emerging regarding anti-racism, equity, and police misconduct. This horribly offended her colleagues for having views contrary to themselves. The trial was five years later, and the doctors still came in to express their overwhelming disgust or disagreement or hurt feelings over things that she posted off-duty on her personal Facebook page. Dr. Pace, going so far as to say that they questioned whether Dr. Castillo had a brain tumor when she expressed views that arguably would be espoused by half the country. When you said personal Facebook page, wasn't she identified as connected to HHS? There was an earlier post before any of the posts kind of at issue here, where she attempted to raise money for the department, where she did identify herself as the chair of the OBGYN department. And did that identification carry through at least some of these posts later? The successive posts did not identify her as such. It was the post about raising money, which was then subsequently, I think she changed her profile to reflect that it was views just of her own at the request of HHS management, who at the time they asked her to do that were not considering demoting her and simply asked her to do that, and she complied. So getting back to the trial testimony, Dr. Nisworski, who succeeded Dr. Castillo as chair, testified that she was offended because of the way the post made her feel, and she couldn't actually remember any of the contact. Dr. Hegard, even at trial, condemned and rebuked my client from the stand. And so there was a lot of emotional force behind what the doctors in the department felt. But importantly, there was essentially no evidence of disruption that should have triggered Pickering balancing, which comes to what I believe is the most important issue in this case. Beginning, I should say, in this Court's Belk v. City of Eldon decision, year 2000 case, the Court again reiterated that a government employer must make a substantial showing that the speech is, in fact, disruptive before the speech may be punished. It is insufficient to show disruption without some evidentiary showing that the functioning of the city government suffered as a result. What case are you reading? Belk v. City of Eldon, Your Honor, a circuit case. And now Belk is bookended. I should say Belk is about internal disagreement to the department or internal tumult to the department. And it's a post-trial case where this Court finds that insufficient to even trigger Pickering balancing. And the bookend on this is a 2025 case, which we did not have the benefit of at the trial in this matter because it came in August of 2025. It's Melton v. City of Forest City, Arkansas. There, a firefighter had reposted someone else's meme, and it caused what the mayor described as a firestorm that disrupted the work environment because police officers, city council members were upset, and phone lines were jammed with calls from concerned citizens. The Eighth Circuit described this as incredibly thin evidence of disruption. This is a summary judgment case, and it's remanded for a trial. I don't understand how you can rely on that today when it's going to trial in October. Melton. Going to trial in October, Your Honor? That's my understanding. Ah. Well, again, this shows that external disagreement is a very. . . It doesn't show anything as a matter of precedent. It's not done. It's not done, Your Honor. But, again, the Eighth Circuit described the evidence as incredibly thin to actually show that there's disruption. And so we have, at least in this Court. What? In what opinion? In what interlocutory opinion? In the Melton case, Your Honor. Well, I know, but it's not a final decision. It's not governing precedent. Well, it's a final decision of this Court on this issue. How can it be? It can't. . . No. Was. . . Come on. Well, it's not post-trial. I'll give you that, Your Honor. It is a summary judgment decision. An interlocutory ruling. Yes, Your Honor. And what. . . And dicta, holding, what? It has to be. . . If it isn't holding on an issue that cannot recur, it's not precedent. Well, it. . . It may have persuasive force, but you're treating it like it's controlling. And your brief does the same thing. Let me come to my point, then, Your Honor, about where I think there is some clarification or new law to be made by this panel. Where other circuits have squarely addressed the issue, most importantly being the Ninth Circuit's decision in Dodge v. Evergreen School District. There, the plaintiff had worn a Make America Great hat, great again hat, to a teacher training, not during school hours. The principal and other teachers were offended by the hat, which the Court held was core political speech. And the principal retaliated against him. And there, the Ninth Circuit said that speech that outrages or upsets coworkers without evidence of an actual injury to school operations does not constitute a disruption. It went on to say, the more tightly the First Amendment embraces the speech, the more vigorous a showing of disruption must be made. Speech about matters of public concern occupies the highest rung of the hierarchy of First Amendment values. And like Dodge... But here, didn't the jury find that there was disruption? Well, this... And wasn't that based on things like threats of doctors to quit and that they had lost confidence in your client, that kind of thing? So, two things about that, Your Honor. Aren't we looking at a clearly erroneous standard? Well, I think we don't get there because, over my objection, interrogatory number two was simply not helpful, because interrogatory number two asked about disharmony and disruption. I thought it was just taken from our model instructions. Well, those model instructions are developed by a committee, and this Court's case law says that the Court does not approve them. Courts routinely say that model jury instructions are an error of law. No, you're arguing everything de novo. I mean, this is crazy. We're reviewing a jury verdict. Well, Your Honor, the standard of review under Pickering is de novo. But to finish answering your question, Judge Grinder, to get into Pickering balancing, you need a finding of disruption. I asked the district court to separate out disharmony and disruption. The district court instead asked a interrogatory asking about disharmony or disruption. That's not helpful. The jury could have felt that there was disharmony, but not disruption. Therefore, if the court finds that that's the salient error, we need a new trial to actually have a jury weigh in as to whether there was disruption. Now, jumping back to just Pickering balancing, I think you don't need to grant or order a new trial for that. On review of this record, if you agree with the Ninth Circuit in Dodge or also the Sixth Circuit in Noble v. Cincinnati in the Hamilton County Public Library, that disagreement or taking offense to off-duty, non-work-related speech is not disruption within the meaning of Pickering. And if we then turn, that's one way to resolve this. If we then turn to just simply balancing, engaging in the Pickering balancing, assuming there was disruption and move on to that, recognize that my client's speech is at the apex of First Amendment protection as political speech. And also, there's an issue of viewpoint discrimination in this case. And the Sixth Circuit found this very significant in Noble. Noble is also about commentary on the Brack Lives Matter movement. And the Court said, also as noted, the library and some of its employees engaged in the same debate as Noble, although on the opposite side, they publicly supported the BLM movement and attended related protests after Noble shared the meme, that the library fired Noble for speech expressing a view contrary to powers that be at the institution, casts doubt on its motive for firing him, and undercuts its workplace harmony interest. There is ample evidence that people at HHS participated in Black Lives Matter rallies. We're on one side of that debate. The Board is endorsing the notion that health equity and anti-racism is central to its mission. My client dissented slightly on her personal Facebook page. And so we have viewpoint discrimination that should cast the view of disharmony as very low in our balancing. Again, my client's speech is at the apex of it. There is, and then turning to your question about. I don't get what you're talking about. It equals viewpoint discrimination. Well. That just goes over my head. Well, viewpoint discrimination is one of the. I know what it is. I also know it's very controversial. And we have cases all over the place. And this does not fit in those cases. When do we have and when don't we have viewpoint discrimination as opposed to something other than that, which tends to drive the First Amendment train? It does, Your Honor. And I think it is important for pickering balancing because essentially everything is on the table here. This is a difficult task that I recognize because the court has to balance a core First Amendment interest against a need for the government to have efficient operations. And it's a value judgment as to how you do that. And, again, I would say the scale on my client's side, on her rights, is absolutely at its apex. And when we talk about efficiency in government operations, it was undisputed at trial that the department was functioning in terms of its deliver of care. Babies were still being delivered. What happened is that members of the OB-GYN department were upset and wanted management to terminate someone who disagreed with them. Not terminate. Excuse me, demote. Adverse employment action.  Well, not with respect to the analysis here. All I need to show is adverse. You don't want it to make any difference at all, but it does to me. Well, the element is adverse employment action. And clearly we have that here because she was demoted. That should not be part of the – that's not part of the Pickering analysis. That's a separate element, and it's undisputed that she had adverse employment action. And so, again, turning to that Pickering balancing, even on this record, this Court should find that my client's interests were paramount when the department was still functioning and we're merely talking about disagreement with my client's views. Now, if you don't agree with that and you think that the jury's determination on interrogatory two is essential, we need to turn to the issue of new trial errors. The district court took the view before trial that the case essentially should – on disruption should turn on whether people were offended by my client's statements on Facebook, and my role was to try and prove that they were not actually offended. My client was prohibited from putting on any evidence about the reasonableness of her statements, the truth of her statements, the basis for her belief that the statements should be part of the debate. We were prohibited from essentially putting on our alternative causation evidence. The theory of our case was – one of the theories of our case was essentially that HHS management riled their employees up by insisting that they take part in one side of this debate. And the doctors ran with that, and they overreacted because HHS management encouraged this. The doctors testified that they spent all kinds of time talking about my client's Facebook page, you know, sharing it with each other while on duty. Management could have put this to a stop by telling professionals to get back to work rather than saying, you spending time on your boss's Facebook page is grounds for us to demote her. And one other key piece of evidence that I couldn't show was a video statement from the actual officers of HHS that would have substantiated this. Amount of time, just to finish what I thought, the district court misapplied the – she requested or required authentication of the video under the grounds by saying it was a foundation issue when the parties had stipulated to the authenticity of the video that I wished to show, that nobody gets past video, and committed error by not admitting it. And for the cumulative error in those reasons, we believe we should have a new trial. If the Court has any questions. Thank you. Thank you, Your Honor. Ms. Pierce? Good morning. May it please the Court. Counsel. As this Court knows, this case is returning to you for a second time. The first time, the Court instructed the district court to apply the flexible pickering test to determine if a score of Facebook posts written by the plaintiff were protected under the First Amendment. The district court did precisely that. It held a five-day jury trial, and the jury answered six special factual interrogatories, one for each of this Court's pickering factors. But it was not a jury issue. Well, factually, the six jury interrogatories were to answer disputed issues of factor, I guess. But they answered those questions decisively in favor of the hospital, in favor of Dr. Costello's employer, Hennepin Healthcare System, Inc., among other things. That's your words, decisively. I don't agree with it. They answered five of them. I should be more precise. They answered five of six interrogatories in favor of the hospital. That's what I meant. Among other things, the jury found that there was a need for harmony and close working relationships in this inner-city hospital where people live and die based on the decisions of medical providers, that the posts caused or reasonably could have caused disharmony or disruption in the workplace, that the posts, which, as Judge Kelley noted, were made to the plaintiff's public Facebook account after she had identified herself both in posts and in the Facebook profile as the chair of the department. Mind you, this is at a time where the plaintiff is on the board of directors at the hospital. So those posts, the jury found, could have been attributed to the hospital or to the OB department. And the jury also found that the posts impaired Dr. Costello's ability to lead the department as its chair. There was, pardon me, there was a, Judge Wilken, you said earlier that there's a big difference between termination and demotion, and we agree. Were this a case where the speech was deemed so objectionable that you had to excise someone, the plaintiff would have been terminated. That's not the case here. She was demoted. The concern of the department.  That's still an adverse employment action. It is, indeed, an adverse employment action. That's right. So this speech had nothing to do with her employment, did it? It didn't directly relate to the hospital or to her patients, but it certainly addressed topics that were of interest to the hospital. And the public. And the public. That's right. So if we were to uphold this verdict and outcome, what guardrails are there that prevent government employees from imposing a heckler's veto upon a coworker? There's a few things there. I want to be very clear at the outset. We are not taking the position that an employee checks their First Amendment rights when they come to the door to work for government. That is not the case. That's not our argument. Employees are free to speak about social issues, about political issues, but they have to do so in a way that's wise, and the plaintiff didn't do so here. HHS's social media policy, which is in the record. That doesn't answer the question about heckler's veto. It's true, and I'll get to that. Thank you, Judge Wilken. Get to it now. That's true. That's good. That's of great interest to me, too. The heckler's veto notion is not something that applies in a case as here, where there is actual internal disruption. If you look for places where that concept has been applied, it applies. And this is the case with your — with the Court's previous opinion in Melvin. Isn't it just pure disagreement with this person? I don't believe so. I don't believe so. And at trial, the jury found that there was disruption. And the disruption that doctors were primarily concerned about, Your Honor, was not a personal disagreement, but that the patient population, that referring providers, that donors would see the speech and be offended and choose to seek care elsewhere. And I'll note, and the district court has this in her opinion, employee disagreement with speech is often recognized as a sufficient basis for a disruption finding. And those are in cases including, pardon me, this Court's opinion in Anzaldúa, Noon, Morgan, Glandon, which is a district court case, and then Labriola, which is out of the Eleventh Circuit. So the idea that employees — that employee reaction to speech is insufficient grounds for disruption runs completely at odds with the case law, including this Court's case law. The core problem in Melvin — But what guardrails are there that would protect this public idea of speech? In other words, isn't it at least possible that some employees would be overly sensitive? Certainly. That's certainly possible. So what guardrails are there that protect the speaker? Well, one important guardrail, and this goes largely unaddressed throughout Dr. Gestel's brief and her argument today, is people in leadership positions need to be very clear that their speech is not speech on behalf of the entity, and that didn't take place here. Now, wait a minute. Where does that come in? In what case law would support that assertion? In what context? Well, there's a pickering factor, Your Honor, about the risk of misattribution, that speech could be misattributed — pardon me — there could be a misattribution between what the speaker says and the idea that it could be on behalf of the entity. That risk is the most heightened when a speaker is very senior in an organization as the case is — as is the case here. So one thing to answer your question, Judge Grunder, that a speaker could do would be on Facebook to say, it's my personal opinion. I'm not speaking for my employer. That didn't happen here. In fact, it was after in this — I said this to Judge Kelly already. It was — the plaintiff had on a number of occasions identified herself as the chair. She was also publicly associated with a department. This may be a little speculative. Sure. But don't you think that it's quite possible that the coworkers would have been equally offended and disrupted even had she said, this is my personal opinion and not the hospital's? It's possible. That's not in the record. And it's not — I mean, when you think about this, it's a flexible balancing test. But the cases where courts are most comfortable with government restriction of speech is where someone occupies a really high position in the organization. So, for example, opposing counsel referenced the Noble case out of the Sixth Circuit. That's a case where a janitor — pardon me, a security guard at a library had had an offensive Facebook post and the court said, no, no, there's no evidence of internal disruption. The speech of a low-level employee is just construed differently under Pickering. And there was ample evidence of actual disruption, and that's measured in three ways. So it's not just a matter of people's personal upset. The driving concern was that patients, referring providers, donors would be offended. And the risk of that in an inner city safety net hospital is that patients will not come to get care. Maybe babies will be able to be born because you have to do that. But if you don't have people come because they don't feel that the providers will be safe, then you run the risk that people don't get health care at all. And we had at least two doctors at trial who testified that four patients raised these posts in clinic and said we saw the posts and are upset. We know of a fifth outsider, and that's I think a nurse outside the hospital who said to a nurse at HHS, I've seen these, what's going on with them? So we have both internal and external disruption here. That's different than Melton. And we have both current disruption. Mr. Craig noted the time that people spent. That considerable lost time is time that the providers uniformly testified was time they could have spent on patient care, on charting, time that they could have spent working. I think I've missed maybe the strongest evidence of disruption, so I'm sorry to be getting to it at this stage. But there's an exhibit in the record, which is a letter from 13 of 14 of the providers. That's at Appendix 376 to 378. And 13 of Dr. Castillo's direct reports said to her, we are so concerned about your speech, we are so concerned that it will offend patients, that we can't be led by you, that we cannot return to a place where you could regain our trust. I can't imagine any better contemporaneous evidence. And that's six months after the posts are discovered. So it's not like the hospital engaged in a knee-jerk, we see your speech, and we're immediately going to terminate you. They thoughtfully and carefully gave. What's the testimony regarding the origin of that letter? The letter was originally written, Your Honor, in September, September, October. So around the time. Who prompted it and why? I believe it was, if I remember the trial testimony right. I don't have a cite for you. It's that the doctors were upset and decided that they needed to raise those concerns. Very strange timing. Looks to me like it was, oh, we need some evidence here to help the case. There's not testimony in the record reflecting that. If it's inferable, then it's inferable. So this letter was initially drafted, and then they wait to see if things get better. And the mood in the department, and here are some of the words that the providers use to describe the mood in this department. Tense. Nerve-wracking. Yeah, they were out together. They were concerned, Your Honor, at the reaction that the speech would prompt in patients. That's the core concern. And that's the concern that the jury agreed with. What was the evidence of the doctor's response to the concerns raised by the doctors that were under her supervision? I'm sorry, the response by whom? Well, you said that they submitted a letter explaining their concerns, that they were concerned about her leadership, and then they waited. And I wondered, I guess I was inferring that the waiting was to see whether things might improve. Maybe the doctor would have a talk with them, and they would work through something. I just wonder what was in the record. What was the waiting period for? So the speech is discovered in September, and there's conversations throughout the workplace about it. And then this letter is written, I want to say, about a month later. That's my recollection. And they don't give it to her at the time. They don't transmit it to Dr. Gosilla because they're waiting to see if things will improve. And then they don't. There are efforts, I mean, there are a few conversations between Dr. Gosilla and people in the department. And those don't, they're not acrimonious, but there's not an understanding expressed by the doctor of the distress she has caused. And so the letter is eventually given to her in March of 2021. Now, in the meantime, the hospital has hired consultants to come in and try to see, understand these workplace issues and to improve them. There are department meetings that are convened to discuss these posts. Again, if you want to talk about efficient operations of a hospital, conducting a special workplace assessment and then having department meetings to discuss it is anything but efficient. So there's both actual disruption here and there's potential future disruption here. And I don't want to forget that because two providers testified at trial that they would have left the hospital if Dr. Gosilla had remained chair. Another said she would have started looking. Another four said if there had begun to be a hill, a rock rolling downhill of people leaving, they too would have left or considered leaving. In a hospital with 13 or 14 OBGYNs, if you have a quarter, a third, a half of them begin to leave, maybe you can deliver babies emergently, but you can't do any procedures on female reproductive organs or the other sort of clinical services that are so important for this high-risk, high-needs population. Pickering exists because government entities have very important interests. Here it's the interests of these patients. The hospital's mission is to do something they call providing exceptional care without exception. That means providing care to everyone, regardless of their ability to pay or their health status. Pickering balancing exists because the government's interests are really important, and that's the case here. Many of the cases recognize that public safety organizations like law enforcement agencies, police, fire, have a particularly heightened interest, and that's true in the medical care field as well. If you look at the Glandon case, and that's out of the Southern District of Iowa, they find this heightened interest. So for all these reasons, because of Dr. Castillo's role as a visible leader at the hospital, as a board member, the court should follow the jury's findings. The jury's findings are amply supported by the evidence here, and the district court was right to weigh Pickering balancing as she did. This is not a case that involves a novel issue of law. Many cases, and these are in our brief, address the question of social media speech that's not ostensibly about the workplace. This court needs to create no new rule. So if you were to be in our position in writing this, how would you write it in a way that didn't create a heckler's veto situation? I think there you focus on, I mean, it'd be an affirmance, and you'd say that the court properly balanced the Pickering factor because of the level of disruption here when a leader speaks. When a leader speaks, and there's both internal and external disruption, as was the case here. That's the syllabus point, I suppose, Your Honor, although I don't know that it needs a syllabus because I think you're just engaging in a straightforward application to Pickering. That's what we think this case is, and we'd ask the court to affirm. So we write, so we let you get away with opening the door at the trial. I'm sorry. The truth is not a defense, but a relevant inquiry. And you cut that off, I think, very dubiously. And then you open the door at trial, and the district court lets you get away with it, and you're saying just ignore that. Well, Your Honor, there were two questions. Right? No, I don't agree with that. You would have us write an opinion that didn't get into that. I don't think the evidentiary issues were an abuse of discretion. What? An abuse of discretion. I don't think that the court's evidentiary rulings was an abuse of discretion. That cumulatively would have required a new trial. And the reason why that is. That's the harder question. So the veracity, the truthfulness of Dr. Gosillo's speech, she talked about throughout the trial. There's record evidence from her on that. And counsel, in his closing argument, said that our clients, that our witnesses, had admitted that Dr. Gosillo's statements were true. So that argument was put before the jury, Your Honor, and they concluded as they did anyhow. So we'd ask the Court to affirm. I'm happy to answer any other questions if you have them, but thank you for your time. Thank you. We out of time? We're out of time? Yes. All right. Never mind. I apologize. I'll give you a minute because these are complicated issues. I'll be very brief, Your Honor. Judge Loken, regarding your question about the timeline of the doctors being out to get here, the record shows that Dr. Hilden had a September of 2020 meeting with my client where he testified that he was not considering demoting her at this time. I believe then the drafting of this doctor letter followed, management not going along with it, and then they hired these consultants, the HSDI consultants, not to investigate my client for disciplinary reasons but as a climate survey. And so, again, even at that late date, management was not planning on demoting my client. And then in January, members of the department without my client have a meeting with management where they are again demanding that action be taken. So I believe it supports Your Honor's notion that the timeline shows that they were out to get here, out to get her. As to the – I believe there's a question about my client's response. So Dr. Nisworski testified that Dr. Gosfilo did have a response e-mail that she found inadequate because it wasn't a concerted apology about how the post made others feel. Okay. This is – this is minutiae. Okay. If there's any other questions? Thank you, Your Honors. Thank you, counsel. Case rate is a difficult contentious issue that we've seen before but not in this forum, of course. So it's been thoroughly brief. If arguments help, we'll take it under advisement.